**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HABITAT FOR HORSES, INC., et al.,      ) | |
|          ) | |
|        Plaintiffs,    ) | Civil Action No. 10-7684 (WAP-KNF) |
|          ) | |
|     -against-     ) | **PLAINTIFFS' REPLY BRIEF IN SUPPORT** |
|          ) | **OF MOTION FOR PRELIMINARY** |
| KEN SALAZAR, in his official capacity as    ) | **INJUNCTION** |
| Secretary, U.S. Department of the Interior;    ) | |
| et al.,     ) | |
|          ) | |
|        Defendants.    ) | |
| _____) | |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ......................................................................................... 1

II.    ARGUMENT ................................................................................................ 1

    A.    The ASPCA's Standing is Clearly Established .................................... 1

    B.    Plaintiffs Demonstrate Irreparable Injury ............................................ 3

            1.    The Twenty-Seven Day "Delay" Is Meaningless Here ............................ 3

            2.    The Organizational Plaintiffs' Injuries Cannot Be Remedied .................. 4

            3.    The Individual Plaintiffs' Aesthetic Injuries Are Severe and Permanent ................................................................................................. 5

    C.    Plaintiffs Have a High Likelihood of Success On the Merits ................ 5

            1.    Defendants Are in Direct Violation of the Wild Horses Act .................... 6

                 a.    No Excess Finding Has Been Made for the NPHA ...................... 6

                 b.    Defendants Cannot Eliminate A Herd .......................................... 7

            2.    Defendants' NEPA Violations Are Clearly Alleged ................................. 7

    D.    Plaintiffs' Interests Tip the Balance of Hardships Strongly In Their Favor .......... 9

# TABLE OF AUTHORITIES

Page

## <u>CASES</u>

*United States v. 27.09 Acres of Land etc.,*
  760 F. Supp. 345 (S.D.N.Y. 1991) ........................................................................... 5

*Am. Horse Protection Ass'n v. Frizzell,*
  403 F. Supp. 1206 (D. Nev. 1975) ........................................................................... 5

*American Horse Protection Ass'n v. Watt,*
  694 F.2d 1310 (D.C. Cir. 1982) ............................................................................ 10

*Amoco Prod. Co. v. Village of Gambell, Alaska,*
  480 U.S. 531 (1987) ................................................................................................. 5

*Bill Barrett Corp. v. U.S. Dep't of Interior,*
  601 F. Supp. 2d 331 (D.D.C. 2009) ......................................................................... 4

*Brody v. Village of Port Chester,*
  261 F.3d 288 (2d Cir. 2001) .................................................................................... 9

*Brown v. Stone,*
  66 F. Supp. 2d 412 (E.D.N.Y. 1999) ....................................................................... 1

*Carey v. Klutznick,*
  637 F.2d 834 (2d Cir. 1980) .................................................................................... 9

*Chamber of Commerce of U.S. v. Edmondson,*
  594 F.3d 742 (10th Cir. 2010) ................................................................................ 4

*Chevron U.S.A., Inc. v. NRDC,*
  467 U.S. 837 (1984) ................................................................................................. 7

*Citibank, N.A. v. Citytrust,*
  756 F.2d 273 (2d Cir. 1985) .................................................................................... 3

*Clarke v. Securities Industry Ass'n,*
  479 U.S. 388, 107 S. Ct. 750 (1987) ....................................................................... 3

*Colo. Wild Horse and Burro Coalition v. Salazar,*
  639 F. Supp. 2d 87 (D.D.C. 2009) .......................................................................... 6

*Concerned Citizens of Chappaqua v. U.S. Dept of Transp.,*
  579 F. Supp. 2d 427 (S.D.N.Y. 2008) ..................................................................... 5

*Conn. v. American Electric Power Co.,*
  582 F.3d 309 (2d Cir. 2009) .................................................................................... 2

*Cunningham v. English,*
  78 S.Ct. 3 (1957) ..................................................................................................... 4

# TABLE OF AUTHORITIES
*(Continued)*

Page

*The Deal, LLC v. Korangy Pub., Inc.,*
  309 F. Supp. 2d 512 (S.D.N.Y. 2004)............................................................... 3

*Department of Transp. v. Public Citizen,*
  541 U.S. 752, 124 S. Ct. 2204, 159 L. Ed. 2d 60 (2004).............................. 8

*Dodge v. County of Orange,*
  209 F.R.D. 65 (S.D.N.Y. 2002) ....................................................................... 9

*Echeverria v. Krystie Manor, LP,*
  2009 WL 857629 (E.D.N.Y. 2009).................................................................. 1

*Fair Housing Justice Center, Inc. v. Silver Beach Gardens Corporation,*
  2010 WL 3341907 (S.D.N.Y. Aug. 13, 2010).............................................. 2

*Fund for Animals v. Frizzell,*
  530 F.2d 982 (D.C. Cir. 1975)......................................................................... 4

*Hamlyn v. Rock Island County Metro. Mass Transit Dist.,*
  960 F. Supp. 160 (C.D. Ill. 1997) ................................................................... 4

*Havens Realty Corporation v. Coleman,*
  455 U.S. 363 (1982) .......................................................................................... 1

*Lujan v. National Wildlife Fed'n,*
  497 U.S. 871 (1990) .......................................................................................... 1

*Monroe County Conservation Council, Inc. v. Adams,*
  566 F.2d 419 (2d Cir. 1977)............................................................................. 5

*Mylan Pharm., Inc. v. Shalala,*
  81 F. Supp. 2d 30 (D.D.C. 2000) .................................................................... 4

*New York City Environmental Justice Alliance v. Giuliani,*
  50 F. Supp. 2d 250 (S.D.N.Y. 1999).............................................................. 5

*New York State National Organization for Women v. Terry,*
  886 F.2d 1339 (2d Cir. 1989)........................................................................... 1

*New York v. Shinnecock Indian Nation,*
  280 F. Supp. 2d 1 (E.D.N.Y. 2003) ................................................................ 5

*NRDC v. Herrington,*
  768 F.2d 1355 (D.C. Cir. 1985)....................................................................... 8

*Ragin v. Harry Macklowe Real Estate Co.,*
  6 F.3d 898 (2d Cir. 1993).............................................................................. 1, 2

*Rodriguez v. DeBuono,*
  175 F.3d 227 (2d Cir. 1999).......................................................................... 3, 4

## TABLE OF AUTHORITIES
*(Continued)*

**Page**

*Small Refiner Lead Phase Down Task Force v. EPA,*
  705 F.2d 506 (D.C. Cir. 1983) ............................................................................................... 7, 8

*Time Warner Cable of New York City v. Bloomberg LP,*
  118 F.3d 917 (2d Cir. 1997) ...................................................................................................... 9

*Tough Traveler, Ltd. v. Outbound Prods.,*
  60 F.3d 964 (2d Cir. 1995) ......................................................................................................... 3

*United Farm Workers v. Chao,*
  593 F. Supp. 2d 166 (D.D.C. 2009) .......................................................................................... 4

*United States v. Students Challenging Regulatory Agency Procedures,*
  412 U.S. 669 (1973) .................................................................................................................... 2

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) .................................................................................................................... 5

## STATUTES

16 U.S.C. § 1331 ............................................................................................................................ 7

16 U.S.C. § 1332(f)(2) ................................................................................................................... 6

16 U.S.C. § 1333(b)(2) ................................................................................................................ 10

42 U.S.C. § 4332(2)(C) ................................................................................................................. 8

## REGULATIONS

40 C.F.R. § 1508.7 ......................................................................................................................... 8

40 C.F.R. § 1508.14 ....................................................................................................................... 8

43 C.F.R. § 4700.0-5 ...................................................................................................................... 7

I.    **INTRODUCTION**

Defendants' opposition to Plaintiffs' motion is based on two fallacious assumptions which confirm Plaintiffs' entitlement to a preliminary injunction here.  First, Defendants completely miss the clear basis for the ASPCA's standing and the extent to which it has been involved in diverting its resources because of the BLM's violations of federal law.  Second, Defendants rely for much of their opposition on a fiction – that they made a specific determination that the horses in the North Piceance Herd Area (NPHA) were "excess."  They did not, and this collapses their argument on virtually every inquiry this Court must make here.

II.   **ARGUMENT**

A.    **The ASPCA's Standing is Clearly Established**

The ASPCA must show (1) injury-in-fact that is (2) fairly traceable to defendant's actions and is (3) likely to be redressed by court order.  *Havens Realty Corporation v. Coleman*, 455 U.S. 363, 378 (1982).  At the pleading stage the Court must presume not only the truth of the allegations but the existence of facts supporting them.  *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

BLM's conduct causes a very "perceptible impairment" in the ASPCA's ability to carry out its primary goals because of the money spent addressing BLM's actions.  *See Havens Realty*, 455 U.S. at 378-79 (standing where organization forced to investigate defendant's illegal conduct); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (same); *New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1349 (2d Cir. 1989).

The ASPCA's primary focus is companion animal cruelty.  *See* Declaration of Matt Bershadker (Bershadker Dec.), ¶¶ 2-3.  Because of BLM's actions, the ASPCA diverts its valuable resources in two ways that are constitutionally cognizable.  First, its expenditures for legal efforts qualify as injury in fact.  *Brown v. Stone*, 66 F. Supp. 2d 412, 426-27 (E.D.N.Y. 1999); *see also Echeverria v. Krystie Manor, LP*, 2009 WL 857629, *4-*5 (E.D.N.Y. 2009); *Ragin*, 6 F.3d at 905.  The ASPCA's injury fits directly in this category.  Second, it has also diverted (and will continue to divert) hundreds of thousands of dollars to care for illegally-

removed horses and provide information to its members. Bershadker Dec., ¶¶ 3-4. The more horses illegally removed, the more money the ASPCA will be required to divert from its primary programs. *Id.* As long as BLM's underlying policy of violating the Wild Horses Act and relying on inadequate data and ignoring its NEPA requirements continues, the ASPCA will divert its resources from primary purposes to a significantly greater degree than if BLM was following its mandates.

Defendants engage in a selective and restrictive view of the testimony before the Court, which will be further supplemented at the hearing, and which firmly establishes the ASPCA's injury in fact. The ASPCA has spent money in the second category above "*because of the BLM's violation of the Wild Horses Act and other federal laws.*" Bershadker Dec., ¶ 3 (emphasis added). This money is used mainly for "rescue, rehabilitation and care of horses removed by the BLM." *Id.* As Mr. Bershadker's live testimony will confirm, those funds are not, as defendants argue, limited to "rescue and care for horses who were illegally removed by the BLM and are then neglected or mistreated by their adopters." Bershadker Decl., ¶ 7. The Paragraph 7 costs are a tiny fraction of the ASPCA's expenditures.

Defendants have placed all their standing eggs in the basket of the ASPCA's injury-in-fact, without addressing the additional prongs of causation and redressability. This is probably because there is no question that the ASPCA meets those additional requirements. The Second Circuit places an especially light burden on plaintiffs on causation at the pleadings stage. *Conn. v. American Electric Power Co.*, 582 F.3d 309, 346 (2d Cir. 2009). And the ASPCA's expenditures flow directly from BLM's illegal actions in this gather. If successful, the ASPCA's injuries will be redressed, because its diversion of resources would be decreased. *Id.* at 347; *accord United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n.14 (1973) (an "identifiable trifle" will suffice). *See also Fair Housing Justice Center, Inc. v. Silver Beach Gardens Corporation,* 2010 WL 3341907 at *7 (S.D.N.Y. Aug. 13, 2010). Finally, the ASPCA's claims fall easily within the particular statutes' respective lenient zone of interest analysis. *See Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399-400, 403, 107 S. Ct. 750,

757 (1987) (only "plausible relationship" required). The ASPCA's interest in the health and welfare of the wild horses, as well as its interest in the BLM's performance of adequate analysis under NEPA and the Wild Horses Act, meets the undemanding test.

Defendants do not suggest that the individual plaintiffs lack standing. And despite defendants' statement, plaintiff The Cloud Foundation (TCF) unequivocally states the same injury as the ASPCA, as well as additional expenses to care for rescued animals.

**B.      Plaintiffs Demonstrate Irreparable Injury**

1.      *The Twenty-Seven Day "Delay" Is Meaningless Here*

Plaintiffs' irreparable harm is not diminished or waived because they filed this action twenty-seven days after the BLM issued the Decision Record (DR). Defendants' cases hold that "delay may not negate the presumption of irreparable harm if the delay was caused by the plaintiff's . . . good faith efforts to investigate the alleged infringement." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995); *The Deal, LLC v. Korangy Pub., Inc.*, 309 F. Supp. 2d 512, 521 n.33 (S.D.N.Y. 2004) (same). That is of course the case here.

Plaintiffs had to review reams of administrative materials to perform their investigation for this case. Defendants' Opposition alone cites hundreds of pages of relevant documents, and that was just the beginning. Moreover, the DR's limited mention of the NPHA and the fact that it intended to wipe out the horses in a herd area increased the difficulty of Plaintiffs' investigation. And the DR of September 10, 2010 scrapped nearly the entirety of the preliminary and final EAs' recommendations at the last minute, frustrating the effort. It is disingenuous to sharply criticize a four-week window spent reviewing endless documents, devising legal strategy, and drafting a complaint and motion for preliminary injunction.

Defendants' case law is inapposite. One plaintiff waited at least thirteen months before moving for a preliminary injunction. *Tough Traveler, Ltd.*, 60 F.3d at 968. Citibank took more than nine months to file for injunctive relief in *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). Finally, defendants selectively quote *Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999), which does not help them because it actually holds that irreparable harm is not

imminent "*[w]here a movant is found to be able to wait for the outcome of an appeal before obtaining preliminary injunctive relief*." *Id.* (Emphasis added). Here, Plaintiffs took twenty-seven days, and the relief is necessary to prevent their severe harm. *See also Cunningham v. English*, 78 S.Ct. 3, 4 (1957) (250-word opinion simply noting petitioners knew facts for "months and years"); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (pharmaceutical giant's eight-month delay); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (dictum; noting dissatisfaction with forty-four day delay).

2.     *The Organizational Plaintiffs' Injuries Cannot Be Remedied*

The organizational plaintiffs state clear irreparable monetary losses based on BLM's misconduct. *See, e.g.*, Finch Decl., ¶ 5; Bershadker Decl.. ¶ 3; Kathrens Decl. ¶ 3. Because of the sovereign immunity doctrine, these losses constitute irreparable harm. *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010) (financial loss "that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury").

Defendants wrongly claim economic loss constitutes irreparable harm *only* where the movant would go out of business. Opp'n, p. 23. But defendants selectively quote their support for this misplaced argument, *United Farm Workers v. Chao*, 593 F. Supp. 2d 166, 168 (D.D.C. 2009). *Chao* expressly recognized two applicable exceptions -- where "'the damages would be unobtainable from the defendant because it will be insolvent prior to the final judgment; and . . . the nature of the plaintiffs' loss may make damages very difficult to calculate.'" *Id.* at 169 (*quoting Hamlyn v. Rock Island County Metro. Mass Transit Dist.*, 960 F. Supp. 160, 162 (C.D. Ill. 1997)). It is virtually impossible to calculate the missed opportunities from diverted funds and, while the government will hopefully not be insolvent, the sovereign immunity doctrine results in the same effect for plaintiffs. In *Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 335 (D.D.C. 2009), damages *were* recoverable and the case is therefore inapposite. The very nature of plaintiffs' losses here – large sums of money that plaintiffs were forced to spend because of defendants' illegal actions, but for which plaintiffs have no recourse and have compromised other programs – is a textbook definition of "irreparable."

> 3.     *The Individual Plaintiffs' Aesthetic Injuries Are Severe and Permanent*

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545 (1987). This Circuit recognizes irreparable injury occurs when a defendant impairs a plaintiff's interest in observing particular elements of nature. *See, e.g., New York City Environmental Justice Alliance v. Giuliani,* 50 F. Supp. 2d 250, 252 (S.D.N.Y. 1999) (destruction of fifty-six gardens); *New York v. Shinnecock Indian Nation,* 280 F. Supp. 2d 1, 4-5 (E.D.N.Y. 2003) (destruction of a relatively pristine environment).

Defendants' misplaced suggestion that Don and Toni Moore can simply look at other horses is contradicted by the facts in their declarations, additional testimony that will be presented at the hearing, and defendants' cases. These plaintiffs have a special connection with the horses in the NPHA. For over fifty years Don Moore has visited the NPHA. The loss of the special horses in North Piceance, and the elimination of all the horses in *that particular* herd area, would wreak an effect on his life that will be both permanent and severe. *Cf. Concerned Citizens of Chappaqua v. U.S. Dept of Transp.,* 579 F. Supp. 2d 427, 432 (S.D.N.Y. 2008) (irreparable harm from proposed felling of sixty-one identifiable trees); *United States v. 27.09 Acres of Land etc.,* 760 F. Supp. 345, 353 (S.D.N.Y. 1991) (destruction of particular wetlands).

As one of defendants' cited cases suggests, the irreparable harm analysis is serious when "the proposed round-up would extinguish the wild horse population" in an area. *Am. Horse Protection Ass'n v. Frizzell*, 403 F. Supp. 1206, 1219 (D. Nev. 1975). That is *exactly* what the BLM intends to do – eliminate an entire herd in an area of especial importance to plaintiffs.

### C.     Plaintiffs Have a High Likelihood of Success On the Merits

It is the Court's "duty ... to see that the officials and agencies involved have properly considered the relevant factors and that the administrative decision was not arbitrary, capricious or a clear abuse of discretion." *Monroe County Conservation Council, Inc. v. Adams*, 566 F.2d 419, 426 (2d Cir. 1977). Plaintiffs are "not required to prove [their] case in full at a preliminary-injunction hearing. . . ." *Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981).

1.    *Defendants Are in Direct Violation of the Wild Horses Act*

a.    No Excess Finding Has Been Made for the NPHA

"Excess" wild horses are those "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f)(2). If they are not properly determined to be "excess," they cannot be removed. *Colo. Wild Horse and Burro Coalition v. Salazar*, 639 F. Supp. 2d 87, 95 (D.D.C. 2009). Defendants' forty-page brief discusses extensive law and reams of documents, but in all of that, only *one instance* in which the BLM addresses the North Piceance Herd specifically – and even that mention *is not a finding that the horses are excess*. Instead, in derogation of its obligations, in 1997 the BLM determined summarily its plan to "remove all wild horses from these areas." 1997 White River Resource Management Plan ("RMP"), p. 2-26. There is no finding of excess and no explanation of why every wild horse "must" be removed.

The final Environmental Assessment does not address these glaring issues; it simply quotes the passage from the RMP. EA, p. 8. Defendants also contend that the BLM determined in the final EA, p. 33, that "the alternative of not removing the excess horses in the NPHA 'poses the greatest risk to the health and viability of the wild horse population, wildlife populations, water resources, and the vegetative resources.'" Opp'n, p. 33. This misstates the EA. The cited passage refers to populations estimated in Table 6, which refers to "*the PEDHMA only*" – *not the NPHA.*

Every others passage cited by Defendants for the excess finding simply refers to "all wild horses located outside of the PEDHMA." Opp'n, p. 27. The BLM cites the "ecological balance" and "multiple use" buzzwords, but nowhere explains why it "must" remove all wild horses outside the PEDHMA. Notably, the preliminary and final EAs focused almost exclusively on the wild horses *within* the PEDHMA.

The BLM cannot simply determine summarily that the proper number of wild horses in a herd area is zero and then, years later, cite to its own summary determination for the proposition that any number of wild horses over zero are now "excess" without any probe into whether those

wild horses fit the statutory definition. *See Animal Prot. Inst. of Am.*, 109 IBLA 112, 119 (1989) ("the Act does not authorize the removal of wild horses in order to achieve an [appropriate management level] which has been established for administrative reasons, rather than in terms of the optimum number which results in a thriving natural ecological balance and avoids a deterioration of the range."). The BLM's reasoning is circular, and violates federal law. It fails to consider relevant factors and cannot withstand this Court's review under the APA standards.

b.     Defendants Cannot Eliminate A Herd

The preceding section effectively ends the inquiry. Without a proper finding that the horses in the NPHA are "excess," the BLM cannot remove them. Here, the BLM is taking it one step further, and seeks to capture and eliminate every horse in the NPHA.

It cannot be disputed that the BLM intends to eliminate the horses from the NPHA, a "herd area." *See* 43 C.F.R. § 4700.0-5. Despite any deference owed to the BLM under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), this action is impermissible. In fact, *Chevron's* application benefits plaintiffs. This Court's first and only necessary step is determining whether the intent of Congress is clear. *Id.* at 842.

Congress established that wild horses must be "protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. BLM's conduct here blatantly flouts that directive. Section 1333(b)(2) "contains the sole and exclusive authority for BLM to remove wild horses from the public range." *See Animal Prot. Inst. of Am.*, 109 IBLA 112, 126 (1989). That authority does not exist here and thus defendants' actions are arbitrary, capricious, and in violation of the law.

2.     *Defendants' NEPA Violations Are Clearly Alleged*

Initially, Plaintiffs are not barred from suing if they have not provided public comment on agency action. Agencies bear an independent burden to "promulgat[e] [...] a non-arbitrary, non-capricious rule." *Small Refiner Lead Phase Down Task Force v. EPA*, 705 F.2d 506, 534-35 (D.C. Cir. 1983). A plaintiff who does not comment forfeits *only* "technical objections" to the

agency's decision. *Id.* This rule applies to NEPA. *See NRDC v. Herrington*, 768 F.2d 1355, 1433 (D.C. Cir. 1985). Defendants ignore this distinction. *See also Department of Transp. v. Public Citizen,* 541 U.S. 752, 764, 124 S. Ct. 2204, 159 L. Ed. 2d 60 (2004) (no need for comment where flaws in EA are obvious).

As a factual matter, plaintiff The Cloud Foundation did provide public comment on this gather, and the Moore plaintiffs' interests were represented by other commenters. Additionally, one of the exact arguments made by plaintiffs was presented by Barbara Flores, who claimed the NPHA horses "should be left there and only removed when they are proven to be 'excess' under the Law." EA, Appendix G, p. 2, comment 11; page 6, comment 22. Another commenter noted that the BLM "did not include as part of the alternatives analysis, an analysis of what will be done with the horses after the gather." EA, Appendix G, p. 1, comment 2. Thus, the BLM was on full notice of these issues.

Defendants misunderstand plaintiffs' argument regarding their NEPA analysis failure. NEPA requires an assessment of every agency action significantly affecting the "human environment," which is "the natural and physical environment and the relationship of people with that environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.14. In the lengthy list of documents defendants cite to prove NEPA compliance, *nowhere* do they evaluate the effect on observers of emptying the NPHA of horses. As established by Don and Toni Moore, who are certainly not alone, this is a major effect that BLM has simply ignored. The BLM has arbitrarily and capriciously avoided analysis of the impact the *elimination of all* of the horses of the NPHA will have on the human environment.

The BLM must also properly consider the cumulative impact of its actions. 40 C.F.R. § 1508.7. As Defendants indicate, the EA provides ample sections with "cumulative impact" in the title. Opp'n, p. 35. The clear NEPA violation, though, is lack of consideration of the cumulative impact of the BLM's practice of complete removals of wild horses from herd areas.

Finally, plaintiffs did not intend to suggest that the BLM has classified its entire long-term holding program as categorically exempt. It is unclear how much of the program is exempt,

but NEPA is violated even if only the significant impact of the short-term processing of gathered wild horses is given the exclusion from NEPA. The BLM warehouses large numbers of wild horses annually in short-term facilities before processing them through to their ultimate destinations. An operation of this magnitude—even if relatively short in duration for any given wild horse—cannot warrant a blanket exemption. The BLM has failed to engage in the proper analysis of this processing, and the FONSI should be set aside.

### D.    Plaintiffs' Interests Tip the Balance of Hardships Strongly In Their Favor

Defendants are correct that the Second Circuit has "warned against granting preliminary injunctions that would needlessly injure the public interest." *Brody v. Village of Port Chester*, 261 F.3d 288, 290 (2d Cir. 2001). It has *also* warned, however, that "in some litigation against the government, no party has an exclusive claim on the public interest." *Time Warner Cable of New York City v. Bloomberg LP*, 118 F.3d 917, 923 (2d Cir. 1997). Defendants assume, wrongly, that this factor favors them. *See, e.g., Dodge v. County of Orange*, 209 F.R.D. 65, 77 (S.D.N.Y. 2002) (public interest favored plaintiff over state). As in *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980), "[t]he problem is that the [BLM] assumes that the public interest is solely with it, because it is a public agency." This is not so, especially here.

First, given the irreparable harm that will befall all plaintiffs, and the fact that plaintiffs speak for and represent a much larger community of Americans concerned about the BLM's policies, the public interest factor clearly swings in plaintiffs' favor. In contrast, BLM offers nothing but harm to its proprietary function and administrative needs, and a financial impact that is minuscule in relation to its budget for its wild horse program.

The rest of Defendants' alleged hardships are *non sequiturs*. Defendants claim the NPHA ecosystem would be harmed if the horses are returned, but their main argument for removing them is that they are outside the PEDHMA, not that they pose a threat to the area. And the absence of a valid "excess" determination defeats this argument. Indeed, such a determination would be difficult to square with BLM's allowing the horses to inhabit the area for a decade. It is hard to comprehend how a few score of horses over 80,000 acres could cause a

deterioration in the range.  Defendants' hardship argument arise from the conflation of two

groups – the PEDHMA horses, which BLM has determined is overpopulating the range, and the

NPHA, which is simply present where BLM would not wish it to be.  *American Horse*

*Protection Ass'n v. Watt*, 694 F.2d 1310 (D.C. Cir. 1982), is inapposite.  That case discussed

removal under 16 U.S.C. section 1333(b)(2) for horses in overpopulated areas.  But the BLM

cannot make that claim about the NPHA, and instead relies on section 1333(a) here.


Dated:  October *19*, 2010

By: *Thomas P. Battistoni*
Thomas P. Battistoni (TB 8012)
SCHIFF HARDIN LLP
900 Third Avenue, 23rd Floor
New York, NY  10022
Telephone:  (212) 753-5000
Facsimile:  (212) 753-5044
tbattistoni@schiffhardin.com

Bruce A. Wagman (*Admitted Pro hac vice*)
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA  94105
Telephone:  (415) 901-8700
Facsimile:  (415) 901-8701
bwagman@schiffhardin.com

Valerie Stanley (*Pro hac vice* pending)
D.C. Bar No. 384882
329 Prince George Street
Laurel, MD  20707
Telephone:  (301) 549-3126
Facsimile:  (888) 539-4736
valeriejstanley@yahoo.com
*Attorneys for Plaintiffs*

SF\9871634.1